**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| YAMISE R.,[1]                ) | |
|           ) | |
|     **Plaintiff,**   ) | |
|           ) | |
| **v.**                 ) | **Case No. 1:21-cv-3059 (GMH)** |
|           ) | |
| **KILOLO KIJAKAZI, Acting**  ) | |
| **Commissioner of Social Security,**  ) | |
|           ) | |
|     **Defendant.**   ) | |
|           ) | |

## MEMORANDUM OPINION

Plaintiff, Yamise R., brought this action seeking to reverse the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant" or "the Commissioner"), affirming the cessation of her Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g). She alleges that the Administrative Law Judge ("ALJ") erred in several respects when determining that Plaintiff had the residual functional capacity ("RFC") to perform light work with some additional limitations. More specifically, she contends that the RFC contains vague language and does not account for her moderate limitations in concentration, persistence, and pace. She also argues that the ALJ did not properly conduct a function-by-function analysis and did not properly evaluate the medical evidence. Plaintiff seeks reversal of the Commissioner's decision and a judgment that she is entitled to benefits or, in the alternative, remand for a new

---

[1] Plaintiff's name has been partially redacted in accordance with the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt. to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Dist. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf [https://perma.cc/N9T2-U5XG] (captured July 11, 2023).

administrative hearing.  The Commissioner argues that the ALJ's decision denying Plaintiff benefits should be affirmed.

Based on the parties' arguments and review of the record, Plaintiff's motion for remand is granted and Defendant's motion for judgment of affirmance is denied.[2]

## I.     BACKGROUND

### A.     Statutory and Regulatory Framework

To be eligible for benefits under the Social Security Act, the Social Security Administration ("SSA") must find a claimant to be "disabled," meaning that the individual is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  Once having received benefits, a recipient may thereafter be found no longer be eligible for such benefits if "the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling."  42 U.S.C. § 423(f).  For that reason, if a claimant is found to be entitled to DIB, his or her "continued entitlement to such benefits must be reviewed periodically." 20 C.F.R. § 404.1594(a).  To determine if a recipient of DIB continues to be disabled, an ALJ follows an eight-step sequential evaluation process:

Step one: whether claimant is engaging in "substantial gainful activity;"[3]

---

[2] The relevant docket entries for purposes of this Memorandum Opinion are (1) the administrative record, ECF No. 14; (2) Plaintiff's motion for judgment of reversal, ECF No. 20; (3) Defendant's motion for judgment of affirmance and opposition to Plaintiff's motion for judgment of reversal, ECF No. 21; and (4) Plaintiff's opposition to Defendant's motion for judgment of affirmance/reply in further support of Plaintiff's motion for judgment of reversal, ECF No. 27.  The page numbers cited herein are those assigned by the Court's CM/ECF system.

[3] "Substantial gainful activity" is work that "[i]nvolves doing significant and productive physical or mental duties" and is "done (or intended) for pay or profit."  20 C.F.R. § 416.910; *see also* 20 C.F.R. § 404.1510 (defining "substantial gainful activity" for the purposes of Social Security disability insurance benefits ("DIB") claims).  "If [the claimant is] doing substantial gainful activity, [the SSA] will find that [the claimant is] not disabled."  20 C.F.R. § 416.920(a)(4)(i); *see also* 20 C.F.R. § 404.1520(a)(4)(i) (defining the step one inquiry for DIB claims).

Step two: whether claimant has an impairment or combination of impairments which meets or medically equals the criteria of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings");

Step three: whether medical improvement has occurred;[4]

Step four: if so, whether medical improvement is related to the ability to work;[5]

Step five: if an exception to medical improvement applies;[6]

Step six: whether all of the claimant's current impairments in combination are severe;[7]

---

[4] "Medical improvement is any decrease in medical severity of [a claimant's] impairment(s)" present at the time of the most recent favorable decision. 20 C.F.R. § 404.1594(b)(1). Medical improvement "must be based on improvement in . . . symptoms, signs and/or laboratory findings." *Id.* If medical improvement has occurred "as shown by a decrease in medical severity," the analysis proceeds to the fourth step. *Id.* If not, it skips to the fifth step.

[5] Medical improvement is related to the ability to work if there has been (1) "a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision," and (2) "an increase in [the claimant's] functional capacity to perform basic work activities." 20 C.F.R. § 404.1594(b)(3). Put another way, this step determines "whether or not there has been an increase in the residual functional capacity based on [a consideration of] the impairment(s) . . . present at the time of the most recent favorable medical determination." *Id.* § 404.1594(f)(4). If the medical improvement is not related to the ability to work, the analysis proceeds to step five. If it is related to the ability to work, then the analysis skips to step six.

[6] The regulations "provide[] for certain limited situations when [a claimant's] disability can be found to have ended even though medical improvement has not occurred." 20 C.F.R. § 404.1594(d). Such exceptions fall into two categories: the first category concerns situations where medical improvement has not occurred but the claimant is engaged in substantial gainful activity and includes: (1) "advances in medical or vocational therapy or technology" increasing a claimant's ability to work, *id.* § 404.1594(d)(1); (2) "vocational therapy" such as "additional education, training, or work experience that improves [the claimant's] ability to meet the vocational requirements of more jobs," *id.* § 404.1594(d)(2); (3) evidence that the "impairment(s) is not as disabling as it was considered to be at the time of the most recent favorable decision," based on "new or improved diagnostic or evaluative techniques," *id.* § 404.1594(d)(3); (4) a finding that "[s]ubstantial evidence demonstrates that any prior disability decision was in error," *id.* § 404.1594(d)(4); or (5) a finding that the claimant is "currently engaging in substantial gainful activity," *id.* § 404.1594(d)(5). If an exception under the first category is found, the analysis proceeds to step six.
    The second category of exceptions do not require a determination that the claimant has "medically improved or can engage in substantial gainful activity," *id.* § 404.1594(e) and includes circumstances where: (1) a claimant's "prior determination or decision [finding disability] was fraudulently obtained," *id.* § 404.1594(e)(1); (2) the claimant does not "cooperate" with the agency, *id.* § 404.1594(e)(2); (3) the agency is "unable to find" the claimant, *id.* § 404.1594(e)(3); and (4) the claimant "fail[s] to follow prescribed treatment which would be expected to restore [the claimant's] ability to engage in substantial gainful activity," *id.* § 404.1594(e)(4). If an exception under the second category is found, the "disability will be found to have ended." *Id.* § 404.1594(f)(5). If no exceptions apply, the disability will be found to continue. *Id.*

[7] An impairment or combination of impairments is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "seeing, hearing, [or] speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; exercising judgment; "[r]esponding appropriately to supervision, co-workers[,] and usual work situations"; or "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922; *see also* 20 C.F.R. § 404.1522 (defining a severe impairment for the purposes of DIB claims).

Step seven: whether, given her residual functional capacity, she can perform past relevant work;[8]

Step eight: whether other work exists that the claimant can perform, given her residual functional capacity and considering her age, education, and past work experience.

*See* 20 C.F.R. 404.1594(f); *see Glass v. Kijkazi*, No. 21-cv-5141, 2022 WL 566488 (D.C. Cir. Feb. 23, 2022) (noting that an ALJ uses the eight step analysis in 20 C.F.R. 404.1594(f) when "conducting a periodic review of whether [claimant's] previously established disability persists"); *see also Dowling v. Commissioner of Soc. Sec. Admin.*, 986 F. 3d 377, 383 (4th Cir. 2021) ("SSA regulations establish an eight-step procedure for determining whether a recipient of disability insurance benefits continues to be disabled." (citing 20 C.F.R. § 404.1594(f)(1)–(8))).

### B.    Plaintiff's Disability Claims and Procedural History

Plaintiff was born in 1972.  ECF No. 14-2 at 27.  She has a high school diploma and trade school certifications in armed security, CNA nursing, and as a home health aide.  *Id.* at 65–66. Her earning records show annual earnings between about $1,000 and $7,000 from 2000 to 2004 and between about $10,000 and $14,000 from 2010 to 2019.  ECF No. 14-5 at 16.

Plaintiff originally filed for DIB on April 9, 2008, and was found to be disabled on August 8, 2008, with an onset date of January 1, 2007.  ECF No. 14-3 at 2; ECF No. 14-5 at 2.  The primary diagnosis supporting her disability was affective disorders, with the secondary diagnosis of anxiety disorders.  ECF No. 14-3 at 2; *see also* ECF No. 14-4 at 2 (notice of cessation of benefits identifying that claimant was originally "determined to be disabled . . . due to depression and anxiety"). On June 10, 2019, the Social Security Administration ("SSA") determined that Plaintiff's

---

[8] "Past relevant work" is work "done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 416.960(b)(1); *see also* 20 C.F.R. § 404.1560(b)(1) (defining "past relevant work" for the purposes of DIB claims).  If the claimant can perform his or her past relevant work, a finding of "not disabled" is mandated.  20 C.F.R. § 416.920(a)(4)(iv); *see also* 20 C.F.R. § 404.1520(a)(4)(iv) (defining the step four inquiry for DIB claims).

disability had ceased as of August 31, 2019.  ECF No. 14-3 at 13; ECF No. 14-4 at 2–4.  At that time, Plaintiff alleged that she had "degenerative bone disease, lower lumbar back [sic], HBP, keratoconus eye disease, [and] 20 % hearing loss in right ear."  ECF No. 14-3 at 9.  The SSA scheduled an examination of Plaintiff, at the agency's expense, to determine whether her disability continued.  *Id.*  Plaintiff did not attend the examination.  *Id.*  Finding that there was "insufficient evidence on which to base a determination" that her disability continued, the SSA terminated Plaintiff's benefits.  *Id.* at 10–12.

In June 2019, Plaintiff filed a request for reconsideration.  ECF No. 14-4 at 5. A hearing before a state agency disability hearing officer was scheduled for December 3, 2019, but Plaintiff failed to appear for the hearing.  *Id.* at 11, 23, 26; *see also* ECF No. 14-2 at 45.  Thereafter, she was again determined to be not disabled.  ECF No. 14-4 at 30.  Plaintiff then requested a hearing before an ALJ in April 2020.  *Id.* at 37.  The hearing took place on December 1, 2020, and the ALJ decision stemming from that hearing is the subject of the parties' pending motions in this matter. ECF No. 14-2 at 61; ECF No. 14-4 at 53.

At the hearing before the ALJ, Plaintiff testified that she graduated from high school and went to trade school for nursing and homeland security.  ECF No. 14-2 at 65.  She stated that for the past eight or ten years she has been working as a self-employed nurse, earning about $10,000 each year, but she stopped working around 2019.  *Id.* at 67, 85.  When the ALJ mentioned that the Plaintiff had originally been found disabled due to mental health impairments, Plaintiff asserted that was "not the truth" and that any document so stating was "fraud."  *Id.* at 68.  Plaintiff maintained that she was "found disabled for physical issues" after "a bad car accident" in 2008 after which she could not walk.  *Id.*  She added that she had an impairment to her eyesight, asserting that she has an "eye disease" and is "nearly blind."  *Id.* at 69.  Plaintiff also alleged that she had

"degenerative bone disease in the spine." *Id.* She denied filing a claim for disability based on mental health impairments but explained that she underwent mental health therapy between 1999 and 2006 for "stress." *Id.* at 71–72.

With regard to her physical limitations, Plaintiff testified she was able to lift twenty pounds, but "not too often," and able to lift "maybe five or ten pounds" frequently throughout the day. *Id.* at 80. She testified that "depending on the weather conditions," she could walk or stand for about an hour to an hour and a half before she would need to sit for "a few minutes or maybe about thirty minutes or so." *Id.* at 80–81. Plaintiff lives on the second floor of an apartment building and climbs the twelve stairs to her home as needed. *Id.* at 84. Regarding her eyesight, Plaintiff testified that her vision comes and goes and "could be good for two or three months" and then "out" for a few months. *Id.* at 81–82. During these periods she cannot see clearly, experiencing blurred vision and infection. *Id.* at 82. Plaintiff takes public transit unless necessary due to "car accidents and history" and drives only when she can see clearly. *Id.* at 81. Plaintiff further testified that a nurse comes to assist her each day with housecleaning. *Id.* at 85–86.

Following Plaintiff's testimony, the ALJ presented a series of hypothetical questions to a vocational expert. First, the ALJ proposed an individual who could perform at any exertional level but was limited to

> jobs that have only simple tasks, decisions, and instructions, not performed in a fast-paced production environment. Simple being defined as the terms used in the DOT describing SVP levels 1 or 2. And they'd be limited to occupations not involving high levels of stress, i.e., those requiring independent decision-making, or occupations at which close supervision or close interaction with co-workers or the general public. Close, meaning no more than occasional.

*Id.* at 91–92. The vocational expert testified that a hypothetical person, so limited, would be unable to perform Plaintiff's past work. *Id.* at 92.

When the ALJ further limited the hypothetical individual to light work and added the Plaintiff's age, education, and work history, the vocational expert testified that such an individual could perform multiple jobs in the national economy, including routing clerk, collator operator, or marker. *Id.* When the hypothetical individual was further limited by the ALJ to only "occasional climbing of ramps and stairs only—[meaning] no ladders, no ropes, no scaffolds; occasional balancing, stooping, crouching, crawling, and kneeling[; and avoiding] hazards, such as unprotected heights, moving machinery, commercial driving," the vocational expert testified that the hypothetical individual would still be able to perform the identified jobs. *Id.* at 93. However, the vocational expert stated that if hypothetical individual was off task for more than ten percent of the workday on a consistent basis due to symptoms of impairments, such as vision issues or needing to take unscheduled breaks, that individual would not be able to continue in those jobs, and there would be "no work" in the national economy for her. *Id.* at 93–94.

### C.    The ALJ's Decision

Following the hearing, the ALJ issued his decision denying benefits on May 6, 2021. ECF No. 14-2 at 42–55. That decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on September 14, 2021. *Id.* at 2–5. The following summary of the ALJ's decision will focus on those issues Plaintiff has identified in her appeal to this Court.

#### 1.    Substantial Gainful Employment, Severe Impairments, and the Listings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity through the date of his May 6, 2021 decision. ECF No. 14-2 at 47.

At step two, he found that since June 10, 2019, Plaintiff had the following medically determinable impairments: mood/affective disorder, generalized anxiety disorder, lumbago, low

vision, and obesity.  *Id.*  He then found that Plaintiff did not have an impairments or combination of impairments that meets or medically equaled the criteria of an impairment in the Listings.  *Id.* at 48–49.  He first considered Listings 1.00, 1.15, and 1.16 for musculoskeletal impairments.  *Id.* at 48.  He found that the medical evidence failed to establish that Plaintiff could not use "one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements."  *Id.*  Nor did the record show that she needs "a walker, bilateral canes, or bilateral crutches or a wheeled and seated mobility device involving the use of both hands, as required by listings 1.15 and 1.16."  *Id.*

As to Listings 2.02 and 2.04 related to visual impairments, the ALJ found that the evidence did not establish that claimant's vision in her better eye after "best correction" was 20/200 or less, or that her "visual efficiency of the better eye is 20% or less after best correction," so the requirements of Listings 2.02 and 2.04 were not met.  *Id.*  The ALJ also found that the Listing in Appendix 1 no longer contain a specific category for evaluating obesity, but he considered the "possible effects of [Plaintiff's] obesity in the assessment of claimant's residual function capacity" and found that her obesity did not "cause[] limitations of listing level severity."  *Id.*

As to Plaintiff's mental impairments, the ALJ looked at Listings 12.04 and 12.06 and found that whether considered singly or in combination, the severity of her mental impairments did not meet those required in either Listing.  *Id.*  In determining whether the paragraph B criteria were satisfied, the ALJ determined that Plaintiff had a moderate limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentration persistence or pace; and a moderate limitation in adapting or managing oneself. *Id.* (citing ECF No. 14-9 at 81–95).  Because Plaintiff did not have "at least one 'extreme' limitation or two 'marked' limitations" in any of those domains, the ALJ found that the paragraph B

criteria were not satisfied.  *Id.* at 49.  Similarly, the ALJ found that the paragraph C criteria were not satisfied because the record did not establish that Plaintiff has only "a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life."  *Id.*

### 2. Medical Improvements

At step three, the ALJ found that there have been medical improvements to Plaintiff's impairments, and that by June 10, 2019, "there had been a decrease in medical severity of the impairments present at the time of the CPD of August 8, 2008."[9]  *Id.*  He also noted that Plaintiff was "adamant" in her testimony that her previous disability finding was due to "injuries incurred in a motor vehicle accident" and "not due to any mental health issues."  *Id.*  However, the ALJ found that Plaintiff was originally found disabled by the state agency in August 2008 based on diagnoses of affective disorder and generalized anxiety disorder, "with marked limitation in the social functioning domain and moderate limitation in maintaining concentration, persistence, or pace."  *Id.* at 49–50 (citing ECF No. 14-7 at 62–76).  Since then, the ALJ found that Plaintiff "has had no professional mental health treatment and treatment records from the pain clinic very consistently note normal mood and affect."  *Id.* (citing ECF No. 14-9 at 113–49).  In addition, the ALJ considered a report from a psychological consultative examiner from August 2019, which, although it noted "no current mental health treatment," also found that Plaintiff reported symptoms of depression and anxiety, had a history of a physical attack, had appropriate social skills, full affect, irritable to euthymic mood, mildly impaired attention and concentration, intact memory, and diagnoses including major depressive disorder and posttraumatic stress disorder.  *Id.* at 50 (citing ECF No. 14-9 at 55–62).

---

[9] A "comparison point decision" or "CPD" is the most recent favorable medical decision finding a claimant disabled. ECF No. 14-2 at 47.

At step four, the ALJ found that Plaintiff's medical improvement was related to her ability to work because her RFC, as set forth below, was less restrictive than the one she had in August 2008. *Id.* at 50. As a result, the ALJ proceeded to step six of the sequential analysis, assessing whether Plaintiff's current impairments singly or in combination were severe. *See supra* note 5. The ALJ concluded that Plaintiff's current impairments of "mood/affective disorder, generalized anxiety disorder, lumbago, low vision, and obesity" were severe because they caused more than minimal limitations in her ability to perform basic work activities. *Id.*

3.    Plaintiff's RFC

At step seven, the ALJ determined Plaintiff's RFC based on her current impairments, finding that, since June 10, 2019, she had the capacity to perform "light work,"[10] except that she is limited to occasionally climbing ramps or stairs; can only occasionally balance, stoop, crouch, crawl, or kneel; and must "avoid hazards such as unprotected heights, moving machinery, and commercial driving." *Id.* She is further limited to "jobs that have only simple tasks, decisions, and instructions, not performed in a fast-paced production environment, with simple being defined as the term is used in the DOT describing SVP levels 1 or 2"; and to "occupations not involving high levels of stress, such as those requiring independent decision making, or occupations subject to close supervision or close interaction with coworkers, or the general public, with close meaning no more than occasional." *Id.*

In determining that RFC, the ALJ first found that Plaintiff's medically determinable impairments could reasonably have been expected to cause her alleged symptoms related to her mental impairments, eye condition, and back pain. ECF No. 14-2 at 51. However, the ALJ found that

---

[10] The regulations define "light work" as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. 404.1567(b); ECF No. 14-2 at 50.

Plaintiff's statements as to the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent" with the record evidence. *Id.* To explain that conclusion, the ALJ addressed the "objective" evidence in the record from Plaintiff's treatment notes and considered other evidence in the record, including Plaintiff's own reports of her activities of daily living, as well as medical opinions from psychological consultative examiners. *Id.* at 51–54.

The ALJ first explained that Plaintiff was found disabled in August 2008 by the state agency with diagnoses of affective disorder and generalized anxiety disorder, with a marked imitation in social functioning and a moderate limitation in maintaining concentration, persistence, or pace. *Id.* at 51 (citing ECF No. 14-7 at 62–76). However, the ALJ found that, since that initial finding of disability based on her mental health impairments, Plaintiff has had no professional mental health treatment and her treatment records from a pain clinic "consistently note [her] normal mood and affect." *Id.* (citing ECF No. 14-9 at 113–49). The ALJ also noted that a psychological consultative examiner found in August 2019 that Plaintiff was undergoing no mental health treatment, but that she reported symptoms of depression and anxiety, had a history of a physical attack, had mental status examinations finding that she was somewhat irritable but cooperative, had appropriate social skills, full affect, irritable to euthymic mood, mildly impaired attention and concentration, and intact memory, and had diagnoses including major depressive disorder and posttraumatic stress disorder. *Id.* (citing ECF No. 14-9 at 55–62).

When assessing Plaintiff's back impairments, the ALJ noted that she testified that "she can lift 20 lbs. but not too often, she can lift 5-10 lbs. [F]requently, she has problems standing and walking, she can stand or walk for an hour to an hour and a half, then will have to sit for half an hour, and she is prescribed pain medication for her back." *Id.* at 52. The ALJ also noted that

Plaintiff lives on the second floor of her apartment building and takes about twelve stairs to get there daily or whenever needed.  *Id.*

Assessing the medical evidence as it pertained to Plaintiff's back impairments, the ALJ first pointed to an MRI in November 2018 that "showed only minimal findings."  *Id.* (citing ECF No. 14-9 at 14).  He found that Plaintiff was next seen at a spine clinic in June 2019, where she reported that she was "minimally improved with trigger point injections," and upon examination she presented with tenderness to palpation, positive straight leg raise testing, and intact strength and sensation.  *Id.* (citing ECF No. 14-9 at 11–12).  Plaintiff was diagnosed with lumbar radiculopathy, spondylosis, lumbago, and fibromyalgia and recommended to undergo physical therapy and to continue her medications.  *Id.*  The ALJ then observed that Plaintiff started treatment for her back pain at a pain center in July 2019, where she reported 8/10 low back pain, radiating into her lower extremities, from a motor vehicle accident in 2008.  *Id.* (citing ECF No. 14-9 at 145–46).  Upon examination, she was found to have Trendelenburg gait, 5/5 strength in all groups except for the right lower extremity where she had 4/5 strength, intact sensation, lumbar range of motion limited due to pain, tenderness to palpation, and negative straight leg raise testing.  *Id.*  She was diagnosed with low back pain with radicular symptoms, arthropathy, and lumbar spondylolisthesis and started on a trial of Vicodin.  *Id.*

Thereafter, in January 2020, Plaintiff reported "shooting pain rated 10/10," and examination findings were unchanged.  *Id.* (citing ECF No. 14-9 at 142–43).  In February 2020, Plaintiff had two MRIs showing a small bulge at L4–L5 with minimal stenosis, "no evidence of sacroiliitis, mild degenerative changes at the bilateral sacroiliac joints, and slight anterior angulation of the distal coccygeal segments."  *Id.* (citing ECF No. 14-9 at 148–49).  The ALJ noted that at a follow-up appointment, the MRI showed "left lateral tilt that can contribute to coccydynia," and Plaintiff

was prescribed pain medication.  *Id.* (citing ECF No. 14-9 at 136–39). Turning to March 2020, the ALJ observed that records showed that Plaintiff's low back pain improved without injections, and that she would reschedule injections as needed.  *Id.*  (citing ECF No. 14-9 at 134–35).  And at a follow-up appointment in April 2020, it was noted that Plaintiff's "medication was . . . working well," and that she reported that she was "doing quite well," "tries to stay active," walks, and "uses a cushion for prolonged sitting." *Id.* (citing ECF No. 14-9 at 131–32).  Moreover, Plaintiff reported in July 2020 that she was able to relieve even her worst pain with ice and heat, and it was noted that her pain management regimen was "controlling" her low back pain.  *Id.*  (citing ECF No. 14-9 at 128–29).  In December 2020, while Plaintiff reported an increase in pain in the winter due to fibromyalgia, she had "unremarkable" examination findings and was noted to be "stable on medication."  *Id.* (citing ECF No. 14-9 at 118–21).  Finally, the ALJ observed that in January 2021 Plaintiff was noted to be "stable," that no medicine was detected in her urine, and her prescription medicine had not been renewed for months.  *Id.*  The ALJ also acknowledged Plaintiff's weight of 202 lbs. and stated that he factored any limitations resulting from her obesity into the RFC assessment.  *Id.* at 53.

After reviewing this evidence concerning Plaintiff's back condition, the ALJ determined that her RFC would be limited to light work.  *Id.*

Next, the ALJ assessed Plaintiff's visual impairments.  He started by noting that Plaintiff testified that she has a driver's license, owns a car, drives when her sight is clear, and sometimes uses public transportation.  *Id* at 52–53.  Next, the ALJ acknowledged Plaintiff's testimony that her vision problems can come and go, and sometimes she has a total lack of vision, but other times her vision is good.  *Id.* at 53.  The ALJ also noted that Plaintiff was recommended for a cornea transplant, but according to Plaintiff, she had not yet scheduled the procedure because of its six-

month recovery period.  *Id.*  Plaintiff also testified that she had a nurse assist her eight hours per day, seven days per week for the past three months because of her back and vision impairments. *Id.*

The ALJ went on to examine Plaintiff's eye records from May 2019, which report that her visual acuity was 20/80 on the right and 20/40 on the left.  *Id.*  (citing ECF No. 14-8 at 43).  At a June 2019 evaluation, Plaintiff failed a contact lens trial due to infections, and her vision was measured as 20/80 in right eye and 20/30 in the left.  *Id.* (citing ECF No. 14-8 at 120–22).  There, the doctor diagnosed her with bilateral keratoconus, and she was encouraged to follow up for surgical approval.  *Id.*  Plaintiff did not follow up until November 2020 when she complained of blurred vision.  *Id.*  Again, contact lenses were recommended, and she was referred to an ophthalmologist after examination revealed bilateral superficial corneal scarring and thinning.  *Id.*  (citing ECF No. 14-9 at 105–06).  The record shows no additional follow up appointments with respect to Plaintiff's vision.  *Id.*  The ALJ also noted that in August 2019 Plaintiff reported to the psychological consultative examiner that "she drives when she can see well and she uses public transportation." *Id.* (citing ECF No. 14-9 at 61).

After reviewing this evidence concerning Plaintiff's visual impairment, the ALJ determined that her RFC would preclude work around hazards.  *Id.*

The ALJ then moved to an assessment of the medical opinion evidence.  ECF No. 14-2 at 53.  An August 2019 report by Dr. Jessica Smedley, a psychological consultative examiner, concluded that Plaintiff had major depressive disorder and posttraumatic stress disorder, and, as a result, had moderate limitations in all interaction domains and in the domain of concentration, persistence, and pace.  *Id.* at 53 (citing ECF No. 14-9 at 55–62).  Dr. Smedley concluded in her report that "[t]he results of [Plaintiff's] examination appear to be consistent with psychiatric

problems, and this may significantly interfere with the claimant's ability to function on a daily basis." ECF No. 14-9 at 61.  "Weighing the evidence most favorably to [Plaintiff]," the ALJ found the psychological consultative examiner's opinion to be "somewhat persuasive."  *Id.* at 53.  Nevertheless, he observed that Dr. Smedley's report noted that Plaintiff had not been in mental health treatment since 2006, and that her spine clinic records "consistently note normal mood and affect." *Id.* at 51, 53.

The ALJ then turned to the state agency examination, noting that it found that Plaintiff suffered only from mental health impairments and "indicated [she] can do simple routine tasks and low stress work with moderate limitations in all domains."  *Id.* at 54 (citing ECF No. 14-9 at 77–95).  The ALJ found this opinion persuasive as to Plaintiff's mental health limitations; however, he found that the state agency "failed to consider" Plaintiff's severe back and vision impairments, as well as her obesity.  *Id.*

Based on his review of these medical opinions and the "evidence of record as a whole," the ALJ determined that Plaintiff had the RFC as detailed above since June 10, 2019.  *Id.*

### 4.      Conclusion of the Eight-Step Sequential Inquiry

Relying on the vocational expert's testimony based on that same RFC, the ALJ found that Plaintiff would be precluded from performing her past relevant work as a certified nursing assistant since June 10, 2019.  ECF No. 14-2 at 54.  However, continuing to rely on the vocational expert's testimony, the ALJ determined that considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform, including routing clerk, collator operator, and marker.  *Id.* at 54–55.  Accordingly, the ALJ concluded that Plaintiff was not disabled since June 10, 2019.  *Id.* at 55.

## II.     LEGAL STANDARD

A federal district court has jurisdiction over a civil case challenging a final decision of the Commissioner.  42 U.S.C. § 405(g).  A reviewing court must affirm the Commissioner's decision if it is based on substantial evidence in the record and the correct application of the relevant legal standards.  *Id.*; *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004).

"[T]he plaintiff bears the burden of demonstrating that the Commissioner's decision is not based on substantial evidence or that incorrect legal standards were applied.  *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 64 (D.D.C. 2006).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It requires "more than a scintilla [of evidence], but can be satisfied by something less than a preponderance of the evidence."  *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (quoting *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002)).  "The substantial evidence standard requires considerable deference to the decision rendered by the ALJ."  *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995).  The reviewing court may neither reweigh the evidence presented to it nor replace the Commissioner's judgment "concerning the credibility of the evidence with its own."  *Id.* at 3; *see also Butler*, 353 F.3d at 999 (finding that the district court's role is not to reweigh the evidence but only to determine whether the ALJ's findings are "based on substantial evidence and a correct application of the law").  However, "this standard of review requires the Court to carefully scrutinize the entire record to ensure that the Commissioner, through the ALJ, has both analyzed all of the evidence available and has sufficiently explained his/her reasoning and the weights given to the facts."  *Pinkney v. Astrue*, 675 F. Supp. 2d 9, 14 (D.D.C. 2009); *see also Lane-Rauth*, 437 F. Supp. 2d at 65 ("[T]his standard of

review 'calls for careful scrutiny of the entire record,' to determine whether the Commissioner, acting through the ALJ, 'has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits[.]'" (second alteration in original) (quoting *Butler*, 353 F.3d at 999)).   Moreover, the Court's job is to "consider the grounds actually proffered by the ALJ" rather than to make those determinations for itself, *Ward v. Berryhill*, 246 F. Supp. 3d 202, 210 (D.D.C. 2017), or credit "post-hoc rationalization[s]" advanced by the parties, *Cooper v. Berryhill*, No. 16-cv-1671, 2017 WL 4326388, at *5 (D.D.C. Sept. 28, 2017).   *See also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (holding that a reviewing court "must judge the propriety of [an agency's judgment] solely by the grounds invoked by the agency"); *Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) (citing *Chenery*, 332 U.S. at 196).   In applying this standard, courts "must also be mindful of the harmless-error rule. Consequently, even if [the court] perceive[s] error," it must "affirm the Commissioner's decision unless the error is prejudicial." *Saunders v. Kijakazi*, 6 F.4th 1, 4 (D.C. Cir. 2021).

## III.   DISCUSSION

As noted, Plaintiff's appeal rests on the ALJ's assessment of her RFC and the ALJ's evaluation of the medical opinion evidence.  Plaintiff first asserts that the ALJ, in determining that she could not perform work in a fast-paced production environment, "failed to provide adequate explanation of the evidence upon which he relied on to make this determination, and failed to provide any explanation of what he meant by the term 'fast-paced production environment.'"  ECF No. 20-1 at 8–9.  Second, Plaintiff asserts that the ALJ "failed to include any limitation upon concentration or persistence in either his residual functional capacity assessment or in his hypothetical question to the vocational expert." *Id.* at 11.  Third, Plaintiff argues that the ALJ failed to "perform a proper function-by-function assessment of the Plaintiff's abilities to perform work-related

activities." *Id.* at 16.  And fourth, Plaintiff argues that the ALJ "failed to properly evaluate perti-nent evidence," including two medical opinions, and evidence relating to Plaintiff's visual impair-ments.  *Id.* at 17–19.  Two of Plaintiff's arguments succeed—first, that the ALJ did not explain the term "fast-paced production environment," and second, that the RFC did not adequately account for Plaintiff's moderate limitations in concentration, persistence, or pace.

### A.    Plaintiff's RFC Contains Impermissibly Vague Language

Plaintiff's first argument concerns the phrase "fast-paced production environment" used in her RFC determination.  Although the ALJ determined that Plaintiff could perform "simple tasks, decisions, and instructions, not performed in a fast-paced production environment," Plaintiff con-tends that this determination is problematic because the ALJ did not explain what he meant by "fast-paced production environment."  ECF No. 20-1 at 9; *see* ECF No. 14-2 at 49.  The under-signed agrees and finds that the ALJ did not properly define the phrase "fast-paced production environment."

This Court, and others, have found similar language in an RFC to be impermissibly vague and a basis for remand.  *See Mirlin T. v. Kijakazi*, No. 20-cv-960, 2021 WL 9217635, at *9 (D.D.C. Aug. 24, 2021), *report and recommendation adopted*, 2022 WL 3139032 (D.D.C. Aug. 5, 2022) (finding that the phrase "fast pace or strict production quotas," without further explanation, was vague in its phrasing); *see also Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019) (finding that RFC language limiting claimant to work which did not "require[e] a production rate or demand pace" did not give the judge enough information to understand the meaning of those terms, and thus frustrated meaningful appellate review); *Perry v. Berryhill*, 765 Fed. App'x 869, 872–73 (4th Cir. 2019) (finding that the phrase "non-production oriented work setting" was not a well-defined term of art); *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015) (discussing how the phrase "fast

paced production," without further definition of the phrase, "would have been impossible for the [vocational expert] to assess"); *Wendy S. v. Saul*, No. 19-cv-3553, 2021 WL 168444, at *3 (D. Md. Jan. 19, 2021) (finding that the limitation of "no fast pace or strict production requirements" was unreviewable without further explanation from the ALJ); *but see Johnson v. Kijakazi*, No. 18-cv-2749, 2022 WL 2452610, at *3 (D.D.C. July 6, 2022); *Johnson v. Saul*, No. 19-cv-3829, 2021 WL 411202, at *6 n.5 (D.D.C. Feb. 5, 2021). In *Thomas v. Berryhill*, for example, the Fourth Circuit remanded where the ALJ limited the plaintiff's RFC to work that did not "requir[e] a production rate or demand pace" because the ALJ did not "give . . . enough information to understand what those terms mean" which made it "difficult, if not impossible, for [the court] to assess whether their inclusion in [the plaintiff's] RFC is supported by substantial evidence." 916 F.3d 307, 312; *see also Mirlin T.,* 2021 WL 9217635, at *9; *Perry,* 756 Fed. App'x at 872–73. This is especially the case where the phrase used is not a "common vocationally relevant functional limitation," as the phrase used here appears not to be. *Thomas*, 916 F.3d at 312. As discussed in *Perry v. Berryhill*, some terms such as "unskilled work" are terms of art that are defined in SSA regulations. *See* 765 Fed. App'x at 872. But when terms like "fast-paced production environment"—or as in *Perry*, "non-production oriented work setting"—are presented to a court, there is no such analogous regulatory definition to guide its review. *Id.*

An ALJ's failure to use such commonly understood phrases in an RFC, or to otherwise define the phrases used, not only prevents the reviewing court from conducting a meaningful review of the RFC, but also "prevent[s] the vocational expert from providing accurate testimony about the positions in the economy that [the plaintiff] could feasibly perform," where, as here, the ALJ uses an undefined phrase when questioning the vocational expert. *Mirlin T.*, 2021 WL 9217635, at *9; *see also Varga*, 794 F.3d at 815; *Wendy S.*, 2021 WL 168444, at *3; EFC No. 14-

2 at 91.  As explained in *Varga*, the term "fast paced production," without a definition, would make it "impossible for the [vocational expert] to assess whether a person with [claimant's] limitations could maintain the pace proposed."  794 F.3d at 815; *see also Petty v. Colvin*, 204 F. Supp. 3d 196, 205 (D.D.C. 2016) (an ALJ's failure to convey accurately the claimant's limitations to the expert can serve as grounds for reversal because it "undermines the expert's testimony that a claimant can perform other work," an instrumental aspect of determining whether the claimant qualifies for disability benefits).  Here, there is no telling what the vocational expert interpreted the phrase "fast-paced production environment" to mean because the ALJ provided no additional clarity as to what he meant the phrase to denote.  "[I]f the relevant RFC terms are 'not common enough for [a court] to know what they mean without elaboration' . . . [t]he Court cannot decisively say that had the ALJ elaborated on the RFC terms, the [vocational expert] would have identified the same, or any, positions the hypothetical person could perform."  *Geneva W. v. Comm'r, Soc. Sec. Admin.*, No. 18-1812, 2019 WL 3254533, at *3 (D. Md. July 19, 2019) (internal citation omitted)).

For these reasons, Plaintiff's motion is granted with respect to the use of that undefined phrase, and the case will be remanded to the SSA for further administrative proceedings.

### B.  The RFC Did Not Adequately Account for Plaintiff's Moderate Limitation in Concentration, Persistence, and Pace

Plaintiff's argument concerning the ALJ's assessment of her moderate limitation in the domain of concentration, persistence, and pace ("CPP") is twofold.  First, she claims that the ALJ "failed to include any limitation upon concentration or persistence in either his residual functional capacity assessment or in his hypothetical question to the vocational expert."  ECF No. 20-1 at 11. Next, Plaintiff argues that the RFC failed to adequately address her moderate CPP limitations.  *Id.* This Court disagrees with Plaintiff's first argument but agrees with her second that the RFC fails to adequately address her CPP limitations, thus warranting a remand on that basis as well.

      1.      The RFC Contains Limitations Relevant to Concentration, Persistence, and Pace

Plaintiff argues that the ALJ failed to include in the RFC assessment or hypothetical questions to the vocational expert any limitation upon her abilities to concentrate or persist, despite her moderate CPP limitation found by the ALJ.  EFC No. 20-1 at 11.  This argument is inherently contradictory because Plaintiff first argues that there are no such limitations included in the RFC, but then goes on to argue that the limitations it includes are inadequate.  *Id.* at 11–12.  Regardless, to the extent Plaintiff is arguing that there are no CPP limitations included in the RFC, she is wrong.  Limiting Plaintiff to "simple tasks, decisions, and instructions, not performed in a fast-paced production environment" is a CPP-based restriction.  *See Mitchell v. Kijakazi*, No. 19-cv-2560, 2021 WL 5310541, at *5 (D.D.C. Nov. 15, 2021) (finding that an RFC restricting claimant to "simple one to four step routine, repetitive tasks," among other restrictions, was a limitation relevant to CPP); ECF No. 14-2 at 50.  Thus, Plaintiff's argument that there are *no* CPP restrictions in the RFC is incorrect.

      2.      The RFC Did Not Sufficiently Account for Plaintiff's Moderate Limitation in Concentration, Persistence, and Pace

That said, the Court agrees with Plaintiff that the restrictions contained in the RFC related to CPP were insufficient, without further explanation from the ALJ, to account for the moderate limitation in that domain that he found Plaintiff possesses.  ECF No. 20-1 at 16; ECF No. 14-2 at 48 (ALJ finding that Plaintiff has a moderate limitation "with regard to concentrating, persisting, or maintaining pace").  The CPP domain "refers to the [claimant's] abilities to focus attention on work activities and stay on-task at a sustained rate."  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(3).  In SSA parlance, a "moderate" limitation means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt.

404, subpt. P, app. 1 § 12.00(F)(2)(c).  Though the SSA regulations do not define "fair," as this Court has previously explained, "a moderate limitation in maintaining concentration, persistence, or pace 'necessarily establish[es] some deficit in [the claimant's] ability to sustain focused attention and concentration long enough to permit the timely and appropriate completion of tasks commonly found in work settings.'"  *Nsiah v. Saul*, No. 19-cv-42, 2020 WL 12948519, at *14–16 (D.D.C. May 12, 2020) (alterations in original) (quoting *Terri D. v. Berryhill*, No. 17-cv-22, 2018 WL 4688740, at *8 (W.D. Va. Sept. 28, 2018)); *see also Demetria R. v. Kijakazi*, No. 20-cv-3227, 2022 WL 3142376, at *14 (D.D.C. June 30, 2022), *report and recommendation adopted*, 2022 WL 3139026 (D.D.C. Aug. 5, 2022).

Many ALJs attempt, like the ALJ did here, to account for a "moderate" CPP limitation by restricting the claimant's RFC to simple, routine, unskilled, and/or repetitive work (or some derivation of those limitations).  These attempts to account for a moderate CPP limitation have received mixed reviews by federal courts.  *Compare, e.g.*, *Patrice V. v. Saul*, No. 18-cv-2221, 2019 WL 3778771, at *5 (D. Md. Aug. 12, 2019) (finding that limiting the claimant to one to four step routine, repetitive tasks did not, without further explanation, sufficiently address moderate CPP limitations) and *Eichelberger v. Colvin*, No. 16-cv-3299, 2018 WL 2740018, at *2 (D. Md. Apr. 12, 2018) (similar), *with*, *e.g.*, *Taft W. v. Saul*, No. 19-cv-2781, 2020 WL 7074628, at *4 (D. Md. Dec. 3, 2020) (finding that limiting claimant to one to four step routine, repetitive tasks adequately addressed moderate CPP limitations), and *Stout v. Colvin,* No. 14-cv-2596, 2015 WL 7351503, at *12 (D. Md. Nov. 20, 2015) (similar).  This is because an RFC that a claimant "can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (internal citations omitted); *see also Petty v. Colvin*, 204 F. Supp. 3d 196, 206 (D.D.C. 2016) (finding that, generally, limiting a claimant to

"simple, routine, and repetitive tasks" is insufficient to address a moderate CPP limitation because "the ability to perform simple tasks differs from the ability to stay on task" (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015))).  Stated differently, "someone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be."  *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020); *see also Johnson*, 2021 WL 411202, at *5 ("As numerous courts have noted, . . . the problem with finding a moderate CPP limitation by requiring 'simple, routine, and repetitive tasks' is that such a restriction, without more, does not actually address plaintiff's mental impairments because the difficulty of a task does not necessarily say anything about his ability to concentrate on it.").

Lacking guidance from the D.C. Circuit on this issue, this Court has maintained an ALJ *can* properly account for CPP limitations by limiting the type of work and tasks the claimant can perform—such as, for example, restricting the claimant's RFC to simple, routine and/or repetitive that require a limited number of steps—*if* the ALJ "explain[s] how such an RFC is consistent with the claimant's trouble with concentration, persistence, or pace."  *Nsiah*, 2020 WL 12948519, at *15 n.4; *see also Demetria R.*, 2022 WL 3142376, at *16 n.16.  The ALJ must, as always, build an "accurate and logical bridge from the evidence to [his] conclusion" and explain why the claimant's ability to perform simple tasks is consistent with an ability to stay on task (i.e., concentrate and/or persist on a task).  *Lane-Rauth*, 437 F. Supp. 2d at 67 (alteration in original) (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).  In other words, it is decidedly not the case that "an RFC limiting a claimant to," for example, simple, routine, unskilled, and/or repetitive work and tasks with a limited number of steps "can *never* be consistent with a moderate limitation in maintaining concentration, persistence, or pace."  *Nsiah*, 2020 WL 12948519, at *15 n.4.  Yet because a "moderate" limitation in CPP implies some deficiency in that area of functioning, "an

ALJ's RFC assessment 'must . . . either adequately account for this deficit or adequately explain why, notwithstanding [that] finding, [the claimant's] overall limitations do not [actually] affect her capacity to sustain simple, routine, or unskilled work.'" *Demetria R.*, 2022 WL 3142376, at *14 (second and third alterations in original) (quoting *Nsiah*, 2020 WL 12948519, at *14). Here, the ALJ did neither. Without providing any explanation, the ALJ restricted Plaintiff's RFC to "jobs that have only simple tasks, decisions, and instructions, not performed in a fast-paced production environment, with simple being defined as the term is used in the DOT describing SVP levels 1 or 2." ECF No. 14-2 at 50. This description is substantially the same as other RFC restrictions that this Court has found inadequate—without further explanation by the ALJ—to address a moderate CPP limitation. *See Nsiah*, 2021 WL 372784, at *15 (concluding that an RFC restricting claimant to "simple, routine, unskilled tasks; occasional changes in a routine work setting; and occasional interaction with the public, co-workers, and supervisors" did not adequately account for plaintiff's moderate CPP limitation); *Mirlin T.*, 2021 WL 9217635, at *10 (finding that the "ALJ's limitations of 'simple work, without fast pace or strict production quotas" did not adequately address plaintiff's moderate CPP limitation); *Demetria R. v. Kijakazi*, No. 20-cv-3227, 2022 WL 3142376, at *14 (D.D.C. June 30, 2022) (finding that limiting claimant "to perform simple, unskilled (SVP 1 or 2) sedentary work" did not adequately account for plaintiff's moderate CPP limitation).[11] The

---

[11] The only difference between the CPP-related restrictions at issue here and those this Court has rejected previously, is the ALJ's attempt to define the word "simple" with reference to how that "term is used in the DOT describing SVP levels 1 or 2." ECF. No. 14-2 at 50. This attempt at clarification does not advance the ball, however. First, the term "simple" is not defined—or even used—in the DOT (Dictionary of Occupational Titles) when "describing SVP levels 1 or 2." *See* Department of Labor, *Dictionary of Occupational Titles: Appendix C: Components of the Definition Trailer*, (4th ed., 1991) *available at* https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFERENCES/DOTAPPC (defining SVP level 1 as "[s]hort demonstration only" and SVP level 2 as "[a]nything beyond short demonstration up to and including 1 month"). Moreover, Specific Vocational Preparation—or "SVP"—is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* It does not address concentration, persistence, or pace, but rather points to the training and orientation necessary for a given job. In any event, because the Court cannot glean what the ALJ meant, it is not possible to evaluate whether his attempt to define "simple" adequately addresses Plaintiff's moderate CPP limitations.

ALJ also restricted Plaintiff's RFC to "occupations not involving high levels of stress, such as those requiring independent decision making, or occupations subject to close supervision or close interaction with coworkers, or the general public, with close meaning no more than occasional." ECF No. 14-2 at 50.  But, again, these additional limitations are not materially different from RFC restrictions that this Court has rejected in the past as being insufficient to address a moderate CPP limitation, without further explanation from the ALJ.  *See Nsiah*, 2021 WL 372784, at *15 (concluding that an RFC restricting claimant to "simple, routine, unskilled tasks; occasional changes in a routine work setting; and occasional interaction with the public, co-workers, and supervisors" did not adequately account for claimant's moderate CPP limitations); *Mirlin T.*, 2021 WL 9217635, at *10 (finding that the "ALJ's limitations of 'simple work, without fast pace or strict production quotas' did not adequately address Plaintiff's moderate limitations in concentration, persistence, or pace").  The ALJ did not "adequately explain why, notwithstanding the finding [that Plaintiff had a moderate CPP limitation, her] overall limitations do not [actually] affect her capacity to sustain simple, routine, or unskilled work.'"  *Demetria R.*, 2022 WL 3142376, at *14 (second and third alterations in original) (quoting *Nsiah*, 2020 WL 12948519, at *14); *see also Laura A.*, 2022 WL 3644810, at *11 (quoting *Nsiah*, 2021 WL 372784, at *15 n.4) ("This Court has maintained that ALJs can properly account for CPP limitations by limiting the type of work and tasks the claimant can perform—such as, for example, simple and routine tasks or work that requires a limited number of steps—if they 'explain how such an RFC is consistent with the claimant's trouble with [CPP].'").  Again, an ALJ can adequately account for a moderate CPP limitation, for example, "by limiting the type of work and tasks the claimant can perform—such as, for example, simple and routine tasks or work that requires a limited number of steps."  *Id.* at *11.  But the ALJ must also actually "explain how such an RFC is consistent with the claimant's trouble

with concentration, persistence, or pace." *Nsiah*, 2020 WL 12948519, at *15 n.4.  Here, the ALJ's opinion provides no explanation as to how, despite Plaintiff's moderate CPP limitations, she is capable of "*sustaining* focused attention and concentration for a significant amount of time," much less the persistence and pace needed to complete a normal workday or workweek notwithstanding her restriction to simple, low stress work.  *Mirlin T.*, 2021 WL 9217635, at *10.  To satisfy this requirement, the ALJ might have pointed to facets of Plaintiff's life where she exhibits sustained focused attention, or testimony that she is capable of doing so.  *Cf. Laura A.,* 2022 WL 3644810, at *9, 12 (denying motion for remand where ALJ expressly concluded that the record did not reflect a significant defect in plaintiff's concentration, relying on an examiner's report showing plaintiff had only "'mildly impaired attention and concentration,' and 'no limitation with her ability to understand, remember or apply simple directions and instructions,'" and plaintiff's own concession  "in her function report that her ability to follow[] both written and verbal instructions was 'good'").  That deficiency is especially problematic here because the psychological consultative examiner, Dr. Smedley—whose opinion the ALJ found "somewhat persuasive"— noted that "[t]he results of [Plaintiff's] examination appear to be consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis."  ECF No. 14-9 at 61.  Nowhere in the ALJ's opinion is that statement addressed.  For that reason, and because the Commissioner advances no argument that the ALJ's error was harmless, the Court has no basis to conclude that the ALJ's failure to account for Plaintiff's moderate CPP limitations was, in fact, harmless.[12]  Accordingly, the Court will grant the Plaintiff's motion for remand on this basis as well.

---

[12] Errors of this kind in the RFC have previously been considered harmless if "(1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace and that the hypothetical question given to the [vocational] expert is limited to only include only unskilled work[] or (2) the hypothetical otherwise implicitly account[s] for a claimant's limitation in concentration, persistence, and

### C.  The ALJ is Not Required to Perform a Function-by-Function Analysis

Plaintiff next argues that the ALJ's conclusion that she could perform light work was improper because he did not first perform a proper function-by-function analysis before reaching that conclusion.  ECF No. 20-1 at 16–17.  Plaintiff relies on Social Security Ruling 96-8p, which states that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis" before the RFC "may [] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p [hereinafter SSR 96-8p], 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  Plaintiff's argument hinges on the premise that the ALJ "failed to evaluate [her] abilities to sit, stand, walk, or lift, yet nevertheless determined that [she] was capable of performing 'light' work," despite her severe back impairment. ECF No. 20-1 at 17.  On this issue, Plaintiff is incorrect.

As this Court has held, "[a]lthough the language of SSR 96–8p requires that the ALJ's RFC assessment '*must address* . . . the remaining exertional . . . capacities of the individual,' this does not require written articulation of all seven strength demands"; instead, "[t]he narrative discussion requirement simply requires the ALJ to explain an 'individual's ability to perform sustained work activities in an ordinary work setting on a regular basis,' and 'describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.'" *Banks v. Astrue*, 537 F. Supp. 2d 75, 85 (D.D.C. 2008); *Simmons v. Saul*, No. 18-cv-1293, 2019 WL 12251882, at *13 (D.D.C. Sept. 30, 2019) ("To the extent that Plaintiff argues that

---

pace[.]"  *Mirlin T.*, 2021 WL 9217635, at *11 (quoting *Petty*, 204 F. Supp. 3d. at 206) (internal quotation marks omitted).  The Commissioner makes no effort to apply that standard here, and the Court will not make that argument for her.

the absence of explicit and separate evaluations of each of the relevant strength categories in itself requires remand (or reversal), he is mistaken."), *report and recommendation adopted*, 2019 WL 12251883 (D.D.C. Oct. 22, 2019).  Indeed, although the D.C. Circuit has not addressed that specific question, *see Banks*, 537 F. Supp. 2d at 84, a number of other Courts of Appeals have indicated that "an ALJ need not expressly discuss a claimant's capacity to perform each work-related function before classifying the claimant's RFC in exertional terms," *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam) (collecting cases from the Sixth, Seventh, and Ninth Circuits). Rather, all the ALJ must do is "provide[] a thorough narrative discussion of the evidence of record regarding the Plaintiff's abilities to perform relevant work-related functions in areas in which Plaintiff alleged limitation." *Jamil D. v. Kijakazi*, No. 21-cv-464, 2022 WL 910334, at *9 (D.D.C. Mar. 29, 2022); *see also Contreras v. Comm'r of Soc. Sec.*, 239 F. Supp. 3d 203, 207 (D.D.C. 2017) ("This court has found that when 'the ALJ provided a thorough narrative discussion of [plaintiff's] limitations,' and has built a 'logical bridge' from the evidence to his conclusion, the RFC analysis does not require 'written articulation of all seven strength demands.'") (quoting *Banks*, 537 F. Supp. 2d at 85).  Such a "narrative discussion 'is sufficient for the ALJ to fulfill [his] obligation to complete a function-by-function analysis that allows the [court] to conduct meaningful review.'" *Nsiah*, 2021 WL 372784, at *14 (quoting *Davis v. Berryhill*, 272 F. Supp. 3d 154, 172 (D.D.C. 2017)).  The ALJ's opinion here properly provides such a narrative discussion that expressed his reasoning underlying his assessment that Plaintiff could perform light work.  *See* ECF No. 14-2 at 52.

As part of that discussion, the ALJ first considered Plaintiff's testimony, including that she stated that she could frequently lift five to ten pounds, infrequently lift twenty pounds, and could walk or stand for an hour to an hour and a half before needing a half hour break to sit.  ECF No.

14-2 at 51–52; *see also id.* at 80-82.  Those limitations, which Plaintiff admitted in her own testi-mony, are consistent with the requirements of light work.  The SSA defines that phrase as requiring "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).  The SSA has further ex-plained that light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday, and that sitting may occur intermittently during the remaining time. Titles II & XVI: Determining Capability to Do Other Work—the Med.-Vocational Rules of App. 2, SSR 83-10, 1983 WL 31251, at *6 (S.S.A. Jan. 1, 1983).  There does not appear to be a material difference between the SSA's definition of light work and what the Plaintiff testified she was physically able to do.  In particular, with regard to her ability to lift, Plaintiff's own stated abilities to lift fall directly within the requirements for light work.  *Compare* ECF No. 14-2 at 51–52 (Plain-tiff testified that she could frequently lift five to ten pounds and infrequently lift twenty pounds) *with* 20 C.F.R. § 416.967(b) (defining light work as lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds).  Regarding her ability to sit, stand, and walk, Plaintiff estimated that she could walk or stand for an hour to an hour and a half before needing a half hour break to sit.  ECF No. 14-2 at 52.  Light work includes standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday, with sitting occur-ring intermittently during the remaining time.  SSR 83-10, 1983 WL 31251, at *6.  Even assuming that requirement is inconsistent with what Plaintiff testified she could do, she points to no medical evidence demonstrating that her back impairment precluded her from performing light work.  *See generally* ECF No. 20-1; *see Davis v. Berryhill*, 272 F. Supp. 3d 154, 172 (D.D.C. 2017) (rejecting a plaintiff's "attempt[] to raise the specter of impropriety on the part of the ALJ without pointing

to any actual medical evidence demonstrating that the RFC assessment failed to sufficiently capture Plaintiff's functional limitations"); *see also Clark v. Astrue*, 826 F. Supp. 2d 13, 22–23 (D.D.C. 2011) (finding function-by-function assessment sufficient where there is no medical evidence contradicting the challenged portion of the claimant's RFC).

The ALJ, on the other hand, reviewed the record evidence concerning Plaintiff's back impairment and concluded that it did not support a greater restriction than light work. The ALJ first noted that a November 2018 MRI showed only minimal findings. EFC No. 14-2 at 52. A 2020 lumbar MRI showed only minimal stenosis and a pelvis MRI showed no evidence of sacroiliitis, and only mild degenerative changes at the bilateral sacroiliac joints, and slight anterior angulation of the distal coccygeal segments. *Id.*; ECF No. 14-9 at 147–149. The ALJ then pointed to medical evidence demonstrating that Plaintiff's lower back pain was improving and responding to treatment. ECF No. 14-2 at 52; *see also* ECF No. 14-9 at 16–27. The ALJ found that medical records from March 2020 showed that Plaintiff's low back pain improved without injections, so an appointment for injections was rescheduled. ECF No. 14-2 at 52 (citing ECF No. 14-9 at 134–35). In April 2020, a report noted that Plaintiff was "doing quite well," "tries to stay active," walks, and "uses a cushion for prolonged sitting." *Id.* (citing ECF No. 14-9 at 131–32). In July 2020, Plaintiff was able to manage her "worst pain" with ice and heat, and her pain management regime was "controlling" her lower back pain. *Id.* (citing ECF No. 14-9 at 128–29). In December 2020, Plaintiff reported no serious mediation side effects and an increase in pain in the winter due to fibromyalgia, but she had "unremarkable" examination findings and was noted to be "stable on medication." *Id.* (citing ECF No. 14-9 at 118–21). Finally, the ALJ noted that in January 2021, Plaintiff continued to be stable and that medicine was no longer detected in her urine drug screen, and her prescription had not been renewed for months. *Id.*

Evidence like the foregoing that conflicts with Plaintiff's assertion that she is physically disabled and that demonstrates the improvement of her back pain in response to treatment was properly used by the ALJ "to discount [her] assertions of disabling limitations," and supports the ALJ's RFC finding of light work.  *Jamil D.*, 2022 WL 910334, at *10 (collecting cases); *see Kim M. v. Kijakazi*, No. 20-cv-2072, 2021 WL 4033060, at *8 (D.D.C. Sept. 3, 2021) (finding that ALJ's analysis of evidence contradicting subjective statements and demonstrating improvement supported RFC finding of light work); *Darlene M. v. Kijakazi*, No. 20-cv-1817, 2021 WL 6841641, at *25 (D.D.C. Sept. 3, 2021) (similar).  Indeed, the state agency examiner found that Plaintiff had no physical health issues—a conclusion which the ALJ rejected because "the state agency component failed to consider limitations caused by claimant's severe back and vision impairments, as well as her obesity."  ECF No. 14-2 at 54.

Based on the foregoing, the Court finds that the ALJ provided a sufficient narrative discussion regarding Plaintiff's ability to perform relevant work-related functions with respect to her back impairment to permit the Court to conduct a meaningful review, and that the ALJ's determination that Plaintiff is capable of performing light work was supported by substantial evidence.  In this regard, the ALJ did all that was required.

### D.   The ALJ Properly Evaluated the Medical Evidence Regarding Plaintiff's Vision Impairment

Finally, Plaintiff argues that the ALJ failed to properly evaluate her eye impairment resulting in fluctuating vision.  ECF No. 20-1 at 18–19.  This argument fails as well.

The ALJ accounted for Plaintiff's visual impairment in her RFC by precluding work involving "hazards such as unprotected heights, moving machinery, and commercial driving."  ECF No. 14-2 at 50.  That finding must be upheld if it is "'supported by substantial evidence' and 'not tainted by an error of law.'"  *Ali*, 236 F. Supp. 3d at 90 (quoting *Porter v. Colvin*, 951 F. Supp. 2d

125, 129 (D.D.C. 2013)).   The question is not, then, whether substantial evidence supports Plain-

tiff's position, but rather, whether there is "such relevant evidence as a reasonable mind might

accept as adequate to support [the Commissioner's] conclusion[s]."   *Id.* at 90 (quoting *Brown v.*

*Bowen*, 794 F.2d 703, 705 (D.C. Cir. 1986)).   That is, "[i]f [the Commissioner's findings are]

supported by substantial evidence, [they] must be sustained 'even where substantial evidence may

support the plaintiff's position and despite that the court's independent analysis of the evidence

may differ from the [Commissioner's].'" *Id.* (final alteration in original) (quoting *Rosado v. Sulli-*

*van*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992)); *see also Morales v. Berryhill*, 484 F. Supp. 3d 130,

140 (S.D.N.Y. 2020) ("Even where the administrative record may also adequately support con-

trary findings on particular issues, the ALJ's factual findings must be given conclusive effect so

long as they are supported by substantial evidence." (quoting *Genier v. Astrue*, 606 F.3d 46, 49

(2d Cir. 2010))); *Kober v. Apfel*, 133 F. Supp. 2d 868, 873 (W.D. Va. 2001) ("The Commissioner's

decision, 'if supported by substantial evidence, must be affirmed even though the reviewing court

believes that substantial evidence also supports a contrary result.'" (quoting *Estep v. Richard-*

*son,* 459 F.2d 1015, 1017 (4th Cir. 1972))).   In this case, the ALJ's findings related to Plaintiff's

visual impairments were supported by substantial evidence.

     In his analysis of the medical and other evidence, the ALJ acknowledged Plaintiff's diag-

noses related to her vision—bilateral keratoconus.[13]   ECF No. 14-2 at 53.   He also considered her

testimony that her vision problems can come and go, and that sometimes she has a total lack of

vision but other times her vision is good.   *Id.* at 52-53.   The ALJ specifically examined Plaintiff's

---

[13] Keratoconus "is an eye condition in which your cornea—the clear, dome-shaped front of your eye—gets thinner and gradually bulges outward into a cone shape.   A cone-shaped cornea causes blurred vision and may cause sensitivity to light and glare."   Mayo Clinic, Keratoconus,   https://www.mayoclinic.org/diseases-conditions/keratoconus/symp-toms-causes/syc-20351352 [https://perma.cc/HJV6-DJJ6] (captured Oct. 16, 2023).

eye records from May 2019 and June 2019. *Id.* at 53. At a May 2019 appointment, Plaintiff "reported no change in vision or pain" and her visual acuity was measured at 20/80 on the right and 20/40 on the left. *Id.* (citing ECF No. 14-8 at 43). At a June 2019 evaluation, her visual acuity measured at 20/80 on the right and 20/30 on the left. *Id.* (citing ECF No. 14-8 at 120–22). The ALJ further considered that in June 2019 Plaintiff declined a contact lens trial—which presumably may have relieved her keratoconus symptoms[14]—and was encouraged by her ophthalmologist to follow up for surgical approval, but there is no record of her doing so after that date. *Id.* Rather, approximately 17 months later, she returned to an eye care professional complaining of blurred vision. *Id.* At that time, Plaintiff was found to have corneal scarring and thinning, and she was again diagnosed with bilateral keratoconus and referred to an ophthalmologist. *Id.* (citing ECF No. 14-9 at 105–06). The record shows no additional vision-related follow up appointments after that date. *Id.* The ALJ also noted Plaintiff's testimony that, despite her vision problems, she had a driver's license, owned a car, drove when her vision is clear, and used public transportation. ECF No. 14-2 at 52–53.

Based on the evidence as a whole, the ALJ accounted for Plaintiff's vision problems by limiting Plaintiff to jobs that did not involve exposure to hazards such as unprotected heights, moving machinery, and commercial driving. *Id.* at 50. The Court finds that conclusion supported by substantial evidence—i.e., more than a mere scintilla. Plaintiff argues that the ALJ did not address the Plaintiff's "variable and fluctuating vision." However, the ALJ did acknowledge Plaintiff's testimony that her "vision problems come and go" and sometimes reports a "total lack

---

[14] "In the early stages of keratoconus, you might be able to correct vision problems with glasses or soft contact lenses. Later, you may have to be fitted with rigid, gas permeable contact lenses or other types of lenses, such as scleral lenses. If your condition gets worse, you may need a cornea transplant." Mayo Clinic, Keratoconus, https://www.mayo-clinic.org/diseases-conditions/keratoconus/symptoms-causes/syc-20351352 [https://perma.cc/HJV6-DJJ6] (captured Oct. 16, 2023).

of vision at times," but chose to focus instead on the results of her repeated, recent examinations in 2019 which showed only a moderate or average vision impairment in her right eye of 20/80, as well as her failure to pursue treatments for her eye condition.  *Id.* at 53; *see also, e.g.*, Am. Optometric Ass'n, Low Vision & Vision Rehab., https://www.aoa.org/healthy-eyes/caring-for-your-eyes/low-vision-and-vision-rehab [https://perma.cc/BXS5-HXV2] (captured Oct. 16, 2023) (noting that the World Health Organization considers visual acuity of 20/30 to 20/60 as mild vision loss or near-normal vision and of 20/70 to 20/160 as moderate visual impairment).  It is well established that an ALJ "may consider 'whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence,'" *McCormick v. Saul*, No. 18-cv-1704, 2021 WL 2634732, at *9 (D.D.C. June 25, 2021) (alteration in original) (quoting *Butler*, 353 F.3d at 1004–05), including whether the claimant failed to seek recommended treatment, *see Goodman v. Saul*, 233 F. Supp. 3d 88, 108 (D.D.C. 2017); *see also, e.g.*, Titles II and XVI: Evaluations of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304, at *9 (S.S.A. Oct. 25, 2017) ("We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities[.]").  Assessment of a claimant's report of her symptoms "'is solely within the realm of the ALJ' and is only to be disrupted when 'an ALJ fails to articulate a rational explanation for his or her finding.'" *Davis v. Saul*, No. 18-204, 2020 WL 3542232, at *4 (D.D.C. June 30, 2020) (quoting *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012)).  The Court will not, therefore, second guess the ALJ's decision to rely on those parts of the record, rather than Plaintiff's testimony at the hearing.

Next, Plaintiff contends that, because of her vision impairment, her RFC should have included a limitation on her "ability to read, work with small objects, or use a computer." ECF No. 20-1 at 18–19. Plaintiff does not cite any medical record or other evidence of such a limitation. *See id.* Even if evidence supported the imposition of a limitation on activities requiring near visual acuity, any error arising from the failure to include it in her RFC would be harmless because one of the jobs the vocational expert testified that Plaintiff could perform—a collator operator—does not have requirements related to near or far visual acuity or depth perception. ECF No. 21 at 26; *see* Collator Operator, DOT 208.685-010, 1991 WL 671753; *see also Davis v. Berryhill*, 272 F. Supp. 3d 154, 180 (D.D.C. 2017) (finding that to the extent the ALJ's failure to include additional limitations was error, it was harmless where jobs identified by the vocational expert accommodated such limitations). Thus, Plaintiff would still be found not disabled as she could perform a job that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1566(b) (providing that a claimant is not disabled if she can perform other work that exists in significant numbers "in one or more occupations" in the national economy).

## IV.    CONCLUSION

For the reasons stated above, the Court will enter an Order **DENYING** Defendant's motion for judgment of affirmance (ECF No. 21), **GRANTING IN PART** Plaintiff's motion for judgment of reversal (ECF No. 20) to the extent that it seeks reversal, and **REMANDING** this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Date: October 25, 2023

_____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE